please be seated. Next case this morning is Dennis v. Pazan 23-1313, counsel for appellant, if you would make your appearance and proceed please. Yes, your Honorable Judges, Mr. Chief Judge, counsel, my name is Craig Pankratz and I for the Denver Police Department. May it please the court. Chief Pazan is entitled to qualified immunity on Susie Dennis's Fourth Amendment excessive force claim. Qualified immunity protects government officials who do not violate the re-established rights. When an official raises qualified immunity, the plaintiff bears the burden to prove it is inapplicable. Ms. Dennis has failed to meet that burden. Why isn't Mr. Pazan's conduct similar to the supervisory conduct in Buck and Fogarty? Yes, and I was planning on addressing really established prong first, so thank you. Fogarty and Buck involve on-the-scene supervisors observing the protests, making contemporaneous orders in response to protesters. Here we have Chief Pazan, who two to three days before, depending on what conduct we look at, engaged in what he did, excuse me, did what he did that is an issue in this case. He opened a command post, again this was about three days before. He generally authorized the use of less lethal munitions. He appointed a different officer to supervise the protest response. He did not work for the same law enforcement agency as the officer who used the less lethal munition in this case. He did not present when the injury occurred. He allowed his subordinates to act without his specific direction. He did not work for the same agency as the officer who used the less lethal munitions, but he was responsible, was he not? To a degree, yes. The complaint alleges that each agency was responsible for its own officers. However, Denver, because it was happening in Denver, was based on my understanding of the complaint, I accept the point that he wasn't involved in making the contemporaneous decisions about what happened, but if you had to set up a organizational chart, he would have been at the top of that chart, right? I think that's fair to say. Okay. Is the fact that he was not on the scene or present when this happened, when the injury happened, does that alone resolve the supervisory liability claim? Honestly, I don't think it does. I think if he were observing by a video feed or receiving contemporaneous reports, I don't think that is the dispositive factor here. Really, if we're to boil down Fogarty and Buck, what we have in those cases is that that supervisor made a contemporaneous order on the scene in specific protest conduct. Now, if he had been watching from a video or was getting updates and made the same orders, I don't think it would have changed things in Fogarty and Buck, but I think that's the most important issue here, is that it is a contemporaneous specific order to engage in specific action against protesters. Frankly, we just don't have that in Chief Payson's case. He organized the response days before. Then the other issue, the alleged order of selectively enforcing the curfew, again, days before. Also, the alleged praise for the restraint of the officers, that happened, I believe, two days before Ms. Dennis's injury. We've got several days before it, and we just simply do not have a single case where we hold a supervisor, let alone a he or she made days before an injury. This is simply unprecedented, and because it is unprecedented, Ms. Dennis's right is not clearly established. I'd like to move on to the violation problem, unless there's additional questions about the clearly established problem. So even though a non-Denver Police Department officer injured Ms. Dennis, and each law enforcement agency was being at the top, Ms. Dennis claims Chief Payson is liable under the theory of supervisory liability. However, supervisory liability only holds supervisors liable for their own unconstitutional misconduct. I believe another phrase is that it has to be active unconstitutional conduct. We have to have a supervisor violating the Constitution on his own. We cannot have subordinates to the chief. We have to look exclusively at what the supervisor did. Which would be a personal participation element, right? Yes. Okay, well, why can't we say that Chief Payson personally participated by virtue of his general order authorizing the use of less lethal admissions, if that order set the context for the actual unconstitutional conduct, which would have been the shooting of the plaintiff? I mean, why can't one draw a through line that results in personal participation in that situation? So if we were to look at Lewis and However, the distinguishing factor in those cases is that those decisions that the supervisor made were deemed lawful. And because they were deemed lawful, there was no personal participation in a constitutional violation. I think we need to extend that factor a little bit more, not just say personal involvement, it's personal involvement in a constitutional violation. And simply engaging in lawful conduct is not enough to get us there. Even if that lawful conduct has a direct line to the unlawful conduct of the shooting. In other words, at least at a but-for level, there would not be the shooting or use of less lethal munitions but-for the order of Chief Payson. And that's where this bleeds into the causation factor. But-for is not enough. The supervisor has to be... I'm interested in what you're going to say about causation, but before we get there, the complaint alleges that then-Chief Payson authorized less lethal use of force against peaceful protesters. That's the allegation we're on a motion to dismiss, of course. How can that be lawful if the protesters are peaceful? Now, I may be wrong, but I don't believe the complaint uses that language. I believe that was Judge Martinez's finding. But again, I don't think the complaint said that he ordered against peaceful protesters. I could be wrong, and I could be confusing the two. Now, if... In paragraph 32, Denver's policy practice is custom of authorizing and ratifying officers' use of less lethal force to control and suppress the protest caused peaceful protesters to be unlawfully hindered. And that allegation is against Denver with a Monell claim. That is not an allegation against Chief Payson, and it's also trying to meet the requirement that Denver have an unlawful practice or custom that would give rise. You're right, it does say Denver, but it was Chief Payson who authorized these less lethal force. And I believe the allegation... I mean, wouldn't we be drawing inferences at this point in favor of Ms. Dennis? Yes, we do need to draw inferences in favor of Ms. Dennis, but only reasonable inferences. And much of the allegations that are in the complaint are conclusory. He knew about this. He authorized this. He ordered this. But there's no factual development, and so it's not proper to draw inferences in that circumstance. We just don't get there. Does the complaint tell us... It says authorized. Is it written down somewhere? Do we have anything to work off on that? I don't believe so. I believe the allegation is that he authorized the use of less lethal munitions in response to the protests. Again, I could be missing something, and I readily agree to that. And if the allegation is that he authorized against peaceful protesters, I think we need more than that to get a reasonable inference to meet the You were going to say something about causation. Yes, so with causation, it's not enough that there's a but-for line. I think if we look at it in a but-for context, yeah. If we look at CERNA in a but-for context, the director of prison's authorizing the warden to assemble that SWAT-like team, but for that order, then the alleged violation wouldn't have happened. I think that's very clear. When does but-for causation become a moving force? I think it becomes a moving force when the supervisor knew or reasonably should have known that the conduct that he or she is engaging in will likely lead or will reasonably lead to unconstitutional conduct. So if we were to look at this in a Monell context, and I don't think there's really a meaningful distinction between a Monell claim and a supervisor claim because we have to look at the defendant-specific conduct, we can look at those different ways that you establish a policy. And one of the big ones is, was the city on notice of prior unconstitutional conduct? And I think we can look at that in this exact same context. I think if Chief Pazin was on notice that his officers had engaged in prior unconstitutional conduct with less lethal munitions during protests, I think we've got an issue there. I think he has some foreseeability issues. But there's simply no allegations that, beyond bare conclusions, that he was aware that his officers had engaged in prior unconstitutional conduct. Is there any, does the complaint say that all of the protesters were peaceful? Does it make any claim to that effect? I believe the language that it was a mostly peaceful protest. Mostly peaceful. And so I believe there's a reasonable inference there even supporting, given all reasonable inferences, that there was some violence. So if we look at these supervisory factors, let's finally address that state-of-mind factor, which really, in my opinion, merges into the personal involvement factor because this is a Fourth Amendment excessive force claim. So Chief Pazin's individual state of mind really doesn't matter, so we're looking at the reasonableness of his conduct. So we have to consider whether his decision to open a command post, appoint a commander, authorize the use of less lethal weapons, selectively enforce the curfew, and also that that public praise element, we have to look at whether that conduct was reasonable. I think we explained in the brief with the selective enforcement of the curfew on its face, that would be a violation, but it doesn't cause any of these injuries. So we need to look at the other four and see if it is reasonable for him to have engaged in that conduct. Now, usually with an excessive force claim, we look at the Graham factors, but the Graham factors really don't fit here because they deal with an officer on the scene. And so we just need to look at reasonableness. And I think we can actually glean some principles from Graham and other cases that could help us if we need to look at But Graham is really concerned about the need for force, the proportionality of the force, and I think that's really what that focuses on. But because we have a situation here where force was authorized days before, I think we need to look at foreseeability also. So if we look at the need for the force, the proportionality of the force, and the foreseeability, really if we were to apply those factors, Ms. Dennis's claim fails at foreseeability. And we're suggesting that the state of mind that we're talking about is objective reasonableness, right? Correct. And that's going towards the action, the primary action, being the authorization of less lethal munitions, right? Yes. Okay. And I'd like to reserve the rest of my time. Yes. I found one more allegation for you here. I jumped over to 52. Denver and Chief Judge Hazen, so he is mentioned in that one, and it says that they authorized their less lethal uses of force against peaceful protest. Still too conclusory for you? I believe so, yes, because we need factual development as to that element there. But regardless, Your Honor, it's still not clearly established that a police chief under these circumstances could be held liable. And I'll reserve the rest of my time for rebuttal. Good morning, Your Honors. My name is Ingram Wilkinson, appearing on behalf of Plaintiff FLE Susie Dennis. This case is about the administration and promulgation of policies by defendant appellant Paul Posen that authorized the use of force against peaceful and nonviolent protesters, and how those were used in a manner that was objectively unreasonable. The District Court, after a thorough reading of the Third Amendment complaints allegations and application of well-steadied legal principles, determined that defendant Posen was not entitled to qualified immunity on her Fourth Amendment excessive force claim. Given the soundness of this analysis, affirmance of the District Court's conclusion that defendant Posen is not entitled to qualified immunity is required. And of course, mindful in this interlocutory posture that Ms. Dennis must satisfy qualified immunity's two elements, I think it's appropriate to turn to the second, given the direction of a conversation with my friend. And I don't believe Fogarty and Buck can be read in a limiting way to suggest that they do not clearly establish the supervisor's conduct, particularly in this case, was not clearly established. Buck makes quite clear, excuse me, Fogarty, that the supervisor at issue established or was detailed or engaged in detailed involvement with the mechanics of the and continued to say that the District Court determined he planned the police officer's response to the protest, ordered certain arrests, and controlled the deployment of chemical munitions and less lethal projectiles. It was on these bases, these factual bases, that Fogarty determined affirmance of the District Court's conclusion qualified immunity, its application to the supervisor there, was inappropriate. Well, that it was inappropriate. Well, how does that look anything like this case? I mean, the reality is you've got Chief Payson, days before this protest, issuing a general order that would allow the use of less lethal admissions. Full stop. He's not there. He's not directing traffic, as it were, as it relates to the protest that's going on. He's not ordering arrests of anybody. He just said, you can use less lethal admissions. How does that look anything like what went on in Fogarty? I think that's a well-taken question, Your Honor. And I would say that Fogarty and Buck, in two ways, first did not limit themselves to an understanding that a type of on-the-scenes involvement is necessary to overcome the assertion of qualified immunity. But I'd also say that Defendant Payson's involvement in these went far beyond suggesting at one point, days before the protest, that, oh, it may be necessary to exercise unreasonable force against them. As the complaint alleges in paragraphs 29 through 31, this speaks again to causation, Defendant Payson was ably aware, preceding the May 29th press conference, that there had been complaints that the force was unlawful and used excessively against protesters. In light of this, he continued to maintain his policy authorizing precisely that force against protesters, which resulted in Ms. Dennis's injury on May 31st, which postdated the press conference at which he alleged, and my friend alleged, it demonstrates he had no knowledge or a disinterest in suggesting that force against these protesters was required. Well, maintaining a policy of allowing less lethal force, when you have delegated to incident commanders the decision on when to use that force or not, how is that, could that be correlated with Buck and Fogarty when the supervisor was there and that supervisor, very similar to the incident commanders here, was actually making the decision on how to do it, first question. Second, it would seem to me the thrust of what's going on, on clearly established law, is not the question of whether Buck and Fogarty were limited to that. It's a question of whether they gave fair warning to Chief Payson that the scope would go beyond that. Two responses to that, First Your Honor. The first of which is that the suggestion that Defendant Payson was fully sort of delegating his most of the allegations state that he partially delegated authority to an incident commander. So I don't think that that can be read to suggest he wholly abdicated his role as an overseer of these responses. And what other role did he have based on the third amended complaint? What did he do beyond that? The complaint alleges, paragraphs 31 and 32, that Defendant Payson was the final policy maker regarding the policies that were being administered. In addition to sort of having this broader supervisory authority, he was authorizing precisely the type of conduct and force that gave rise to Ms. Dennis' injury. Which was the use of less lethal admissions written at an abstract high level. He wasn't there. He didn't direct them to shoot it at her or shoot it at a group that she was involved in. So, I mean, so what I'm trying to get at is what beyond the fact that he was the top of the food chain, which Opposing Counsel acknowledges, beyond that, I think that to sort of take your Honor's framework as reading Fogarty and Buck, not so much as establishing limiting principles, but establishing requisite notice, those cases certainly state that the authorization of less lethal munition in a way that would knowingly result in the type of injury the plaintiff in that case suffered was sufficient to demonstrate supervisory liability and overcome the assertion of qualified immunity at that stage. So I believe, as in Fogarty and Buck, there was a much more intimate knowledge of precisely the consequences that would result in an authorization, rather than the simple, generalized, atmospheric authorization of force. And I would take my friend's point, which is to say that while it may have been lawful for Defendant Pison to have created this authorization, the thrust of our concern is what were the consequences of the administrability or administration of these policies. So the question really becomes, was the exercise of these policies or their implementation unlawful as applied to Ms. Dennis on May 31st, when in the allegations of the complaint that are well-treated, she was simply walking home from dinner with her roommates and decided to film a protest. In the opening brief, my friend states that she was not even attending the protest. She was merely excited. What that demonstrates is that she was certainly engaging in no activity that could be construed as threatening to any officer. And moreover, around allegations 31 and 32, we state that the complaint alleges that this particular protest was wholly peaceful. So while it is possible, it's certainly not something that is relevant at this stage where the complaint's allegations are taken as true, that other dates of protest, which span May 30th through June 6th, may themselves or later have been violent. On this particular day, at this particular time, the complaint alleges that the protest was peaceful, nonviolent, and the extent to which Ms. Dennis was involved was simply to film it. Well, even if the protest was peaceful on the specific day that Ms. Dennis was involved, if the order was a general order issued before then that just said, you can use less lethal munitions, well, that would cover both days in which there was violence and days in which there wasn't violence. And so at that point, somebody's making a decision. And the person who's making a decision is the incident commander who's on the ground. And so in that sense, both in terms of, let me start with the constitutional issue. Where is the culpability mental state of Chief Pazin in that situation where he issues a general order that covers both violence and nonviolence, which your complaint does not negate the possibility that some of those protests were violent. When he issues that general order, where is the unconstitutional mens rea at that point? I would say two things, Your Honor. The first of which is that the authorization of force does not mean it can be indiscriminately and uncritically applied. So simply because there's an authorization to use force does not mean that its use on the night where a protest is peaceful is appropriate. It demonstrates actually the objective unreasonableness of the response to Ms. Dennis' participation in that protest. The second is that there are two ways to think about the state of mind, the first of which is applying Graham and working through its factors. And we believe, as we've set forth in our brief, and as I'm happy to discuss, that applications of those factors lean squarely and entirely in Ms. Dennis' favor. However, if we take my friend's suggestion and operate under the legal framework that what we're talking about is the need for these protests and the foreseeability of conduct, I would direct the court to allegations 95, which again reiterate that the protest on this particular night was wholly peaceful. And the authorization to use force on this particular evening would actually demonstrate precisely the objective unreasonableness you can arrive at by applying my friend's framework or applying Graham. And regarding the foreseeability of these protests or the need for force, again, if we look at allegations 29-ish through 32, what we have is a knowledge on Defendant Pazin's part preceding the press conference that there had been complaints forced use in prior protests was unjustifiable, unreasonable, and had resulted in injury. And I would say meaningfully, in paragraph 31, Defendant Pazin was conducting this press conference, quote, in response to these complaints. And so I don't think the suggestion that those allegations are not well pleaded is well taken, because these ably demonstrate there was a specific thing to which Defendant Pazin was responding, and that his knowledge of it was full. Let me ask you this. Do you accept, well, how do you treat or, and do you think there is a distinction between a situation in which Chief Pazin says, you can, I don't know what's going to happen out there, guys. It could be violent or it could be nonviolent. So what I'm telling you at the beginning is if you need to, you can use less lethal munitions. Full stop. He stops. That situation and another in which Chief Pazin says expressly to them that you can use less lethal munitions on anybody that you want to use it on, including nonviolent people. Do you think there's a distinction between those two things? I do, Your Honor. And I think that what that gets at is whether an authorization that's sort of more generalized and this is one that's a little more tailored to the facts of the case, if there's a distinction there. And I would say that there is. However, the complaint doesn't bear out that this is more in favor of a kind of general authorization and one that's more tailored. And why doesn't it do that? Because it says he authorized less lethal munitions. What else did he do? He didn't on that specific day, the complaint does not say on that specific day, he said, you can use less lethal munitions with my knowledge that the people who are out there are peaceful, right? I think that to the extent there are any questions about this complaint, reading it inferentially and drawing all inferences in Dennis's favor, what we have is a circumstance where Defendant Pazin was fully knowledgeable of ongoing conduct that preceded this evening that was unlawful and resulted in an objectively unreasonable use of force against protesters. And he continued to maintain the applicability of this policy, despite having knowledge of the injuries. And that gets to my question. He continued to maintain that you could use the policy. Why isn't that different than saying he continued to maintain? Well, in that scenario, it means you can continue to use the policy should the need arise. Why is that different than saying he continued to maintain that you can use the policy on anybody? I'm telling you, you can use it on peaceful, non-peaceful, you can use it. Why isn't that different? I would say, Your Honor, that I think that this kind of comes down to taking the complaint's allegations in their entirety as we're authorized to under Chilcote. And it may absolutely be the case that there is a distinction there that becomes meaningful. And I would submit that that might resemble more of a fact question in the summary judgment stage. As Chilcote teaches, that's not our concern analytically at this point. We're simply asking if the complaint plausibly alleges a sufficient throughline in Your conduct and the injury that Ms. Jena suffered. And I believe that reading the complaint in its entirety, putting aside any factual disputes that may ultimately arise that are of no moment in our analysis of the complaint at this stage. Look, counsel, don't we still have a gap between the complaint, the Third Amendment complaint, inferences in favor of the plaintiff, all of those things that you've been arguing, and Fogarty and Buck, in the sense that in those cases where this was a child supervisory liability, it wasn't really because of a general authorization like we have here. It was because the supervisors were on site specifically ordering the conduct. So even if we accept everything you said in the last couple of minutes, isn't there still a gap in terms of clearly established law for qualified immunity? I take Your Honor's point in mindful of my time. I want to answer it and then turn to the elements of supervisory reliability and habitat, which are causation and personal involvement. But I think that thinking about Fogarty and Buck requires thinking about how it is that those supervisors ultimately position themselves on the ground. And I would also like to say to the extent that there's been any suggestion that Defendant Pazin's authorization was simply atmospheric, I don't want to make that point or I want to refute it. I believe that he was sufficiently involved in the conduct underlying this claim to have both been liable as a supervisor, but also to be eligible for having that violation be clearly established by what Fogarty and Buck state and contemplate. I think that reading the litany of allegations or factual findings in Fogarty that gave rise to the suggestion a supervisor was not entitled to qualified immunity. We have, for instance, pointing their response to a protest and controlling the development or deployment of munitions. And so it's certainly the case that Defendant Pazin was not only authorizing the use of force, but authorizing the use of less lethal munitions, the likes of which we see in both Fogarty and Buck. And I would also direct the court, while that was in Fogarty, that Buck says and contemplates that an officer was not entitled to qualified immunity where he authorized his officers to use force against protesters. And so I would say with the remaining of my time, these cases certainly clearly established the law upon which Defendant Pazin's liability may be established. And thinking about personal involvement, these policies and their implementations certainly satisfy that factor. And these policies cause misdemeanors. I see I'm out of time. Unless the panel has any further questions, I would simply ask for affirmation. No, no. Thank you, counsel. Appreciate your argument. So I think that we need to develop my statement that the Chief Pazin authorized use of force against peaceful protesters. I think I need to develop a little bit more why that's conclusory. As your honors know, under Rule 8, a mere possibility is not sufficient. You have to allege a plausible claim. Now, alleging that a chief of police authorized use of less lethal munitions against peaceful protesters, that's implausible. But I think if we had underlying allegations showing actual widespread use of less lethals against peaceful protesters, yes, there's allegations that he was receiving complaints. But complaints do not actually equal events of excessive force. If he actually knew, if there were actually allegations there showing, yes, there was an investigation into it, an independent party, or his own investigator determined, hey, we're overdoing it here. This is improper. Something there that we can plausibly see, okay, yeah, he knew that there was actual excessive force being used, and he actually did authorize less lethals against peaceful protesters. The complaint just doesn't get us over that hurdle. And regardless, there's just too big of a gap between Fogarty and Buck. So I take it your point, and your last point is that if he knew that there was a history of using less lethal munitions against peaceful protesters, the fact that he then maintained, to use your opposing counsel's point, maintained the policy of less lethal munitions would then create the connection. I think so. All right. Thank you, counsel. Case is submitted. Appreciate your arguments.